541 F.2d 1263
 COMMONWEALTH EDISON COMPANY, a corporation,
Petitioner-Plaintiff-Appellee,
v.
GULF OIL CORPORATION, a corporation, et al.,
Respondent-Defendant-Appellants.
COMMONWEALTH EDISON COMPANY, a corporation,
Petitioner-Plaintiff-Appellee,
v.
UNITED NUCLEAR CORPORATION, a corporation,
Respondent-Defendant-Appellant.
COMMONWEALTH EDISON COMPANY, a corporation,
Petitioner-Plaintiff-Cross Appellant,
v.
GULF OIL CORPORATION, a corporation, et al.,
Respondent-Defendant-Cross Appellees.
 Nos. 75-2146 to 75-2148.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 20, 1976.
Decided Sept. 20, 1976.
 
 1
 Richard E. Powell, Thomas G. Ryan, Chicago, Ill., for Commonwealth edison.
 
 
 2
 James T. Otis, Robert A. Creamer, Chicago, Ill., for Gulf Oil Corp.
 
 
 3
 Alan Y. Cole, Walter H. Fleischer, Washington, D. C., Robert F. Hanley, Chicago, Ill., for United Nuclear.
 
 
 4
 Before SWYGERT, Circuit Judge, MARKEY, Chief Judge, Court of Customs and Patent Appeals* and JAMESON, Senior District Judge.**
 
 JAMESON, Senior District Judge:
 
 5
 Plaintiff-appellee brought this diversity action seeking an order, pursuant to Section 4 of the United States Arbitration Act, 9 U.S.C. §§ 1-14, to compel arbitration of controversies related to termination of a contract between the parties to this action and to enjoin a prior pending Illinois state court proceeding involving the same dispute. The district court ordered the defendants-appellants to submit to arbitration but refused to stay the proceeding in state court.[1] Defendants have appealed from the order directing them to submit to arbitration. Plaintiff has cross-appealed from that portion of the order refusing to stay the state court action. We affirm the decision of the district court.
 
 Background
 Parties
 
 6
 Commonwealth Edison Company (Edison) is an Illinois corporation engaged in the business of generating, distributing, and selling electricity in Northern Illinois. Appellant General Atomic Company (General) is a partnership of appellants Gulf Oil Corporation (Gulf), a Pennsylvania corporation, and Scallop Nuclear, Inc. (Scallop), a Delaware corporation. Appellant United Nuclear Corporation (UNC) is a Delaware corporation engaged in the business of mining and selling uranium.
 
 The Contract
 
 7
 On May 25, 1971, Edison entered into a "Reload Fuel Contract" with UNC in which UNC agreed to supply certain future nuclear fuel requirements for Units 1 and 2 of a nuclear power plant under construction by Edison near Seneca, Illinois. UNC on July 1, 1971, assigned the contract to Gulf United Nuclear Fuel Corporation (GUNF) with the consent of Edison. GUNF merged with Gulf on November 30, 1973, and was operated as an unincorporated division of Gulf until its assets and liabilities were transferred to General effective January 1, 1974. As a result of the transfer, General claimed to have succeeded to the rights and obligations of GUNF under the contract.[2]
 
 The Dispute
 
 8
 When Edison and UNC entered into the contract in May, 1971, they anticipated that Units 1 and 2 would be placed in service during the autumns of 1975 and 1976, respectively. However, due to licensing delays by the United States Atomic Energy Commission,[3] Edison in September, 1975, did not expect Units 1 and 2 to be completed until June, 1978, and June, 1979, respectively.
 
 
 9
 By letter of October 4, 1973, Edison notified GUNF of its intent to change the scheduled delivery dates of the reload batches of nuclear fuel for Units 1 and 2 by 42 and 33 months, respectively, because of the anticipated delays in completion of the units. Edison's action was pursuant to section 10.3 of the contract which provided:
 
 
 10
 "At any time twelve (12) months or more in advance of the Scheduled Delivery Date set forth in this Section 10, Purchaser (Edison) shall have the right to set a new Scheduled Delivery Date provided that such new date shall not be less than twelve (12) months subsequent to notice of such change."
 
 
 11
 On July 22, 1974, General, as successor in interest to GUNF, sent a letter to Edison asserting its right to terminate the contract pursuant to section 13 (the force majeure clause) of the contract because of the delivery delays. This section provided in relevant part:
 
 
 12
 "In the event that an excusable delay occurs with respect to Unit 1 or Unit 2 or both, and it is reasonably foreseeable that such excusable delay will delay Purchaser's ability to use the fuel or UNC's ability to deliver it by more than 30 months, the party not suffering the force majeure may terminate and neither party shall have further obligation to the other with respect to fuel not yet delivered."
 
 
 13
 General also based its asserted right to terminate on the belief that the unforeseen delays made the Reload Fuel Contract commercially impracticable within the meaning of § 2-615 of the Uniform Commercial Code.
 
 
 14
 Contesting General's right to terminate the contract,[4] Edison on October 29, 1974, demanded that General, Gulf, and UNC arbitrate the dispute under the Commercial Arbitration Rules of the American Arbitration Association pursuant to the arbitration clause of the contract. That clause provided in pertinent part:
 
 
 15
 "Any dispute arising from this Contract, including any failure to agree upon any matter where this Contract provides for future agreement of the parties, shall be submitted to arbitration on request of either party."
 
 
 16
 In its demand for arbitration Edison sought a declaration of the continued existence and enforceability of the contract or, alternatively, a declaration that General, Gulf, and UNC were in breach of their obligations under the contract and liable to Edison for any resulting damages.
 
 Court Proceedings
 
 17
 On November 13, 1974, General, by its partners Gulf and Scallop,[5] filed an action in the Circuit Court of LaSalle County, Illinois, seeking a declaratory judgment that there was no agreement to arbitrate the dispute over termination of the contract and for an order staying arbitration.[6] In seeking this determination General and its partners relied on § 22.5 of the contract which provided:
 
 
 18
 "The validity, interpretation, and performance of this Contract and each of its provisions shall be determined and governed by the law of the State of Illinois."
 
 
 19
 General and its partners argued that termination of the contract pursuant to the force majeure clause terminated the entire agreement, including the arbitration clause. It was further argued that, in any case, disputes over termination were not within the scope of the arbitration clause. Edison filed motions to dismiss and to compel arbitration.[7] Following a hearing on June 13, 1975, the Circuit Court dismissed the complaint and ordered General and its partners to submit to arbitration. On appeal, the Illinois Appellate Court for the Third District affirmed the judgment of the Circuit Court, finding that the dispute was within the scope of the arbitration clause and therefore arbitrable.[8] That decision is presently on appeal to the Illinois Supreme Court.
 
 
 20
 On January 15, 1975, Edison filed this action against General, its partners Gulf and Scallop, and UNC. On September 30, 1975, the district court ordered the defendants to submit the contract dispute to arbitration, but denied Edison's request to stay the state court action. On January 27, 1976, the court granted General's motion to stay its order pending the outcome of this appeal.
 
 Issues
 
 21
 With this background we proceed to a consideration of the issues presented:
 
 
 22
 (1) Did the district court err in refusing to dismiss this suit in light of the parties' agreement that Illinois law should govern all aspects of the contract?
 
 
 23
 (a) Does the inclusion of a choice of law clause in the contract alter the allocation of functions between a court and an arbitrator from that specified in the Federal Arbitration Act?
 
 
 24
 (b) If not, does the Act require that the issue of termination be decided by arbitration?
 
 
 25
 (2) Did the district court err in this diversity suit by refusing to apply an Illinois law which would have required dismissal?
 
 
 26
 (3) Does the contract contain terms sufficient to bind the parties to an arbitration award?
 
 
 27
 (4) Did the district court err in refusing to stay the state court proceeding?
 
 
 28
 I. Was Refusal to Dismiss Error?
 
 A. The Federal Arbitration Act
 
 29
 The United States Arbitration Act was enacted in 1925. "(R)eversing centuries of judicial hostility to arbitration agreements, (the Act) was designed to allow parties to avoid 'the costliness and delays of litigation,' and to place arbitration agreements 'upon the same footing as other contracts . . . .' " Scherk v. Alberto-Culver Co., 417 U.S. 506, 510-511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974), citing H.R.Rep.No.96, 68th Cong., 1st Sess., 1, 2 (1924); see also S.Rep.No.536, 68th Cong., 1st Sess. (1924). In accordance with this legislative intent, federal courts have liberally construed arbitration clauses, Galt v. Libbey-Owens-Ford Glass Co., 376 F.2d 711, 714 (7 Cir. 1967), generally resolving doubts in favor of arbitration, Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382, 385 (2 Cir. 1961).
 
 
 30
 The key provisions of the Act are found in §§ 2, 3, and 4. Section 2 provides that:
 
 
 31
 "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, of an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
 
 
 32
 "Commerce", as employed in § 2, is defined in § 1 of the Act to mean in part "commerce among the several states". Thus, the Federal Act is limited in its application to maritime transactions and transactions involving interstate commerce.
 
 
 33
 Section 3 requires a federal court, in which an action is brought involving an issue which is arbitrable pursuant to a written agreement between the parties, to stay trial of the action pending arbitration. Section 4 allows a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" to petition a district court for an order compelling arbitration in accordance with the agreement. Upon being satisfied that "the making of the agreement for arbitration or the failure to comply therewith is not in issue", the court is required to make such order.[9]
 
 
 34
 The district court, as well as the parties, have relied upon the leading case of Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), which involved an arbitration clause in a "Consulting Agreement" between Prima Paint Corporation and Flood & Conklin Manufacturing Company. Prima Paint, alleging that the agreement had been fraudulently induced, sued in federal court for rescission, while Flood & Conklin cross-moved to stay the court action pursuant to § 3 of the Federal Act, pending arbitration. The district court granted the stay. In reviewing the Second Circuit's dismissal of the appeal, the Supreme Court discussed the policy considerations upon which the Federal Arbitration Act is based, and enunciated the role of the district court in ruling upon a § 3 motion to stay.
 
 
 35
 The Court, finding that federal law holds arbitration clauses to be separable from the contracts in which they are contained, affirmed the dismissal of Prima Paint's appeal. Prima Paint, supra at 402-404, 406, 87 S.Ct. 1801. In so doing, the Court stated that federal law does not permit a federal court to consider issues of fraud in the inducement of the contract generally, as opposed to fraud in the inducement of the arbitration clause. Id., at 403-404, 87 S.Ct. 1801. Rather, a federal court in passing upon a § 3 application for a stay pending arbitration, "may consider only issues relating to the making and performance of the agreement to arbitrate". Id., at 404, 87 S.Ct. at 1806.
 
 
 36
 Considering next whether the holding was constitutionally permissible under the Erie doctrine, Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), the Court framed the issue in terms of whether "Congress may prescribe how federal courts are to conduct themselves with respect to subject matter over which Congress plainly has power to legislate", rather than whether Congress could establish federal substantive law to control questions arising in simple diversity cases. The Court concluded that Congress could so prescribe the conduct of federal courts in actions under the Federal Arbitration Act, based on Congress' power to control interstate commerce and admiralty. Prima Paint, supra, 388 U.S. at 405, 87 S.Ct. 1801. Thus, Prima Paint required federal courts "to apply rules enacted by Congress with respect to matters . . . over which it has legislative power". Id., at 406, 87 S.Ct. at 1807. With respect to arbitration clauses in contracts involving admiralty and interstate commerce, Congress, through the Federal Act, has allocated to the federal courts the task of determining the issues involved in the making of and compliance with the arbitration agreement, while reserving to the arbitrators all other issues. Id., at 404, 87 S.Ct. 1801.
 
 B. Application of the Act
 
 37
 The contract here is clearly one "evidencing a transaction involving commerce," and thus falls within the scope of the Federal Act. As the district court noted, all parties agree that the agreement to arbitrate was "entered into by the litigants and nobody disputes the fact that one party is unwilling to commence arbitration proceedings". As a general rule, under § 4 of the Arbitration Act, this is all the district court need consider in making its order.
 
 
 38
 Appellants General, Gulf and Scallop, however, contend in effect that the parties by the choice of law provision have altered the allocation of functions between arbitrators and courts. They argue that (1) in a diversity case federal courts are bound to apply state law according to the rules of Erie R. R. Co. v. Tompkins, supra, and cases following, and (2) the Federal Arbitration Act allows the parties to contract regarding the law which is to govern the contract, including the arbitration clause, and even in the absence of a choice of law provision, the Act leaves interpretation and enforcement of arbitration agreements to state law.[10] From this it is argued that the Illinois Uniform Arbitration Act governs the contract and that according to Illinois law, "the question of the present existence of an agreement to arbitrate" is one for court determination.
 
 
 39
 Appellee Edison, on the other hand, contends that the Federal Act is applicable to any contract involving interstate commerce, notwithstanding a choice of law clause, and that the question of allocation of disputes must be resolved by resort to the Federal Act and its policy of facilitating arbitration whenever possible. We find appellee's position to be the more persuasive.
 
 
 40
 While the Court in Prima Paint did not consider a choice of law clause, it did hold expressly that with respect to arbitration clauses in contracts involving interstate commerce, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. The Court stressed also the policy underlying the Federal Arbitration Act "that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts". 388 U.S. at 404, 87 S.Ct. at 1806. Parties are not free to burden the arbitration process under the Federal Act by adopting state law which shifts the determination of disputes from arbitrators to courts. To allow parties to so contract would undermine the provisions of the Federal Act. Congress, in enacting the Federal Arbitration Act, exercised its power over admiralty and interstate commerce. Any arbitration contract involving one of those areas is governed by the Federal Act. To permit the parties to contract away the application of the Act by adopting state law to govern their agreement would be inconsistent with the Act itself and with the holding in Prima Paint.
 
 
 41
 Subsequent to Prima Paint other courts, both federal and state, have concluded that the Federal Act controls despite a choice of law provision, although none involved the precise question presented in this case.
 
 
 42
 For example, the Eighth Circuit in Collins Radio Co. v. Ex-Cell-O Corp., 467 F.2d 995, 997 (8 Cir. 1972), held that "the Federal Act bars resort to state arbitration rules to determine the validity of arbitration clauses in interstate contracts". The contract involved in the suit contained a clause providing that Texas law governed the agreement. Id., at 996. The court continued: "The plain meaning of § 2 is that federal courts are no longer to apply state statutes and decisions which limit arbitration agreements with rules not applicable to other contracts." Id., at 998; accord, Medical Development Corp. v. Industrial Molding Corp., 479 F.2d 345, 348 (10 Cir. 1973). While appellants General, Gulf, and Scallop contend that this latter statement limits the holding of Collins, it merely evidences the Congressional policy, as interpreted by the courts, that the Federal Act is not to be restricted by state law which is hostile to arbitration agreements.
 
 
 43
 Similarly, in American Airlines, Inc. v. Louisville & Jefferson County Air Board, 269 F.2d 811, 815 (6 Cir. 1959), which involved disputes arising from lease agreements adopting Kentucky law, the court said of the Federal Arbitration Act: "Within the scope of the statute circumscribed by the Constitution, Federal law is of course paramount under the Supremacy Clause, and State law must give way. (citations omitted)." As appellants note, the court did look to Kentucky law regarding the Air Board's capacity to contract. Id., at 817. Appellants argue that consideration of state law regarding this issue indicates that state law chosen by the parties is to govern over federal law. But consideration of state law with respect to that issue did not invade the province of the Federal Act since it involved the making of the entire contract, rather than just the arbitration clause. Clearly, under Prima Paint and other decisions, a federal court must consider any question regarding the making of the contract, 9 U.S.C. § 4, and in determining what is necessary to "make" a contract, the court may look to relevant state law. Questions of the validity of an arbitration agreement, however, are governed by the Federal Act and are to be determined by arbitrators. Since this case involves an issue regarding the validity, not the making, of an arbitration agreement, American Airlines directs that it be resolved under federal rather than state law.
 
 
 44
 In other cases federal courts have considered the parties' choice of state law with respect to equitable defenses to enforcement of a contract, Necchi Sewing Machine Sales Corp. v. Carl, 260 F.Supp. 665 (S.D.N.Y.1966), and the proper court for confirmation of an arbitration award, Monte v. Southern Delaware County Authority, 321 F.2d 870 (3 Cir. 1963).[11] But those courts have also recognized that federal law is controlling on the issue of the enforceability of the arbitration agreement. Necchi, supra at 667; Monte, supra at 874.
 
 
 45
 Several state court decisions have found the Federal Act to be controlling over state law chosen by the parties. For example, in Pinkis v. Network Cinema Corp., 9 Wash.App. 337, 512 P.2d 751 (1973), involving a contract in interstate commerce which the parties agreed would be governed by New York law, the Washington Court of Appeals concluded:
 
 
 46
 "In any event, we need not decide whether New York law would require arbitration or permit court proceedings to decide the issues raised in view of our decision that the federal act controls. Further, our discussion has set forth the primacy of the federal arbitration act substantively and procedurally over state law when interstate commerce is the subject matter of the contract in dispute." Id., at 756.
 
 
 47
 Similarly, in Mamlin v. Susan Thomas, Inc., 490 S.W.2d 634 (Tex.Civ.App.1973), the court found the Federal Act to be applicable in spite of the parties' selection of New York law:
 
 
 48
 "The Federal Arbitration Act is the law of New York and also the law of Texas with respect to any 'contract evidencing a transaction involving commerce,' as defined in that act. The federal act has been held to be substantive rather than procedural, and equally applicable in state and federal courts, even though the contract provides that any dispute should be settled by arbitration under the laws of a particular state." Id., at 637.
 
 
 49
 Of the many cases cited by appellants, only one, Lummus Co. v. Commonwealth Oil Refining Co., 280 F.2d 915 (1 Cir. 1960), cert. denied, 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225 (1960), involved the application of the parties' choice of state law in the resolution of a question of the arbitrability of a dispute concerning fraud in the inducement of a contract. Id., at 924-925. There the court followed New York law, which was chosen by the parties, to the effect that an arbitration clause cannot be treated as separable from the other parts of the contract, contrary to federal law which recognizes the severability of arbitration clauses. Id., at 925. Lummus, however, was decided before Prima Paint. The Supreme Court in Prima Paint rejected the rule of Lummus with respect to cases brought in federal courts involving maritime or interstate commerce contracts.[12]
 
 
 50
 Having determined that the contract is governed by the Federal Act, we turn to the question of whether the dispute regarding termination of the contract is arbitrable under the contract and the Federal Act. On this issue we find it sufficient to quote from the opinion in Island Territory of Curacao v. Solitron Devices, Inc., 356 F.Supp. 1, 11 (S.D.N.Y.1973), aff'd, 489 F.2d 1313 (2 Cir. 1973), cert. denied, 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974):
 
 
 51
 "It has been determined by highest authority that 'claims of fraud in the inducement of the contract generally' are exclusively for the arbitrators. Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967).
 
 
 52
 "If fraud in the inducement is for the arbitrators, then even more so is any issue, such as frustration and termination, arising after an admitted execution of an agreement. This follows from the reasoning of Prima Paint. It has been held that 'whether circumstances have arisen which have discharged one or both parties from further performance' is a question for the arbitrators. Heyman v. Darwins, (1942) A.C. 356, 366, quoted with approval in In re Pahlberg Petition, 131 F.2d 968, 970 (2 Cir. 1942). It has been specifically held that 'frustration of performance of the contract' is an issue solely for the arbitrators. Goldhill etc. v. Caribbean Shipping Co., 56 F.Supp. 31 (S.D.N.Y.1944)."
 
 
 53
 Not only is the termination dispute arbitrable according to the Federal Act, it is also arbitrable under § 16 of the contract which allows arbitration of "any dispute arising from this Contract". The attempted termination of the contract by General was clearly a dispute arising from the contract and was arbitrable.[13]
 
 II. Failure to Apply Illinois Law
 
 54
 Appellants next contend that in a diversity case the Erie doctrine requires federal courts to apply the law of the state in this case § 48(1)(c) of the Illinois Civil Practice Act (Ill.Rev.Stat. ch. 110, § 48(1)(c) (1975)).[14] Section 48(1)(c) permits a defendant to obtain dismissal of an action when "there is another action pending between the same parties for the same cause". It is argued that because the prior state court case was "for the same cause", the federal court was required to dismiss under § 48(1)(c).
 
 
 55
 As appellee contends, however, this action is not a simple diversity suit, but involves federal rights asserted under the Federal Arbitration Act. Were it simply a diversity suit involving a non-federal claim, the Erie doctrine would require the court to consider Illinois law. Erie and its progeny do not bind federal courts where rights are asserted under an act of Congress: "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." Erie R.R. Co. v. Tompkins, supra, 304 U.S. at 78, 58 S.Ct. at 822.
 
 
 56
 Illinois federal courts have recognized this limitation of the Erie doctrine. In Seaboard Finance Co. v. Davis, 276 F.Supp. 507, 513 (N.D.Ill.1967), a case which also involved the application of § 48(1)(c) in federal court, the court noted: "(F)ederal courts are required to apply the constitutional, statutory, and common law of the state in which they sit whenever faced with a non-federal question of law."[15] (Emphasis added.)
 
 
 57
 Here, however, we have a federal question. This action to compel arbitration pursuant to § 4 of the Federal Arbitration Act is a suit involving rights governed by act of Congress. Both under the terms of Erie, supra,304 U.S. at 78, 58 S.Ct. 817, and Prima Paint, supra, 388 U.S. at 405, 87 S.Ct. 1801, it is governed by federal, not state, law. Section 48(1)(c) was not applicable and the district court did not err in refusing to apply it.
 
 III. Sufficiency of Contract Terms
 
 58
 UNC in its separate brief contends that the terms of the contract do not bind the parties to any arbitration award, and that the district court should not have ordered arbitration which will not be binding, but advisory only. UNC's argument centers on the provisions of 9 U.S.C. § 9 which allow a court[16] to confirm an arbitration award "if the parties in their agreement have agreed that a judgment of the court shall be entered upon the award . . . ." It is argued that the arbitration clause in the contract, which provides that the arbitration proceedings are to be conducted "in accordance with the rules of the American Arbitration Association",[17] does not contain a provision for entry of a judgment on the award, thereby making any award non-binding on the parties.
 
 
 59
 UNC bases this argument on Varley v. Tarrytown Associates, Inc., 477 F.2d 208 (2 Cir. 1973), which held insufficient an arbitration clause (very similar to that involved here) which provided: "Any controversy arising under this agreement or breach thereof shall be settled by arbitration pursuant to the rules of the American Arbitration Association." Id., at 209. The court found no explicit agreement to make an award binding. Id., at 210. While the rules of the AAA had been incorporated into the agreement, there was nothing in those rules indicating that the parties thereby consented to entry of judgment on the award.[18] Id.
 
 
 60
 UNC further contends that without an agreement providing for entry of judgment on an award, the federal court is without jurisdiction to enter the judgment under § 9 of the Federal Act. Hellman v. Program Printing, Inc., 400 F.Supp. 915, 917 (S.D.N.Y.1975), citing I/S Stavborg v. National Metal Converters, Inc., 500 F.2d 424, 426 (2 Cir. 1974). UNC argues, therefore, that under Varley the district court could not properly require the parties to submit to arbitration under the Federal Act.
 
 
 61
 However, as Edison notes in its brief, UNC's argument ignores significant developments in the law and changes in the Rules of the AAA since Varley. The agreement of the parties to have any arbitration governed by the rules of the AAA incorporated those rules into the agreement, as the Varley court recognized. Varley, supra at 210, citing Reed & Martin, Inc. v. Westinghouse Elec. Corp., supra. At the time of execution of the contract in this case, Rule 1 of the AAA provided:
 
 
 62
 "The parties shall be deemed to have made these Rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association or under its Rules. These Rules and any amendment thereof shall apply in the form obtaining at the time the arbitration is initiated." (Emphasis added.)
 
 In 1973 Rule 46(c) of the AAA was added:
 
 63
 "Parties to these Rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any Federal or State Court having jurisdiction thereof."[19]
 
 
 64
 This amendment, although not in effect at the time Varley was decided, was in effect at the time Edison initiated arbitration and thus is binding on the parties according to the terms of the contract.
 
 
 65
 This conclusion is supported by I/S Stavborg v. National Metal Converters, Inc., supra, which was decided after Varley. The court in Stavborg explained that Varley did not require an explicit agreement to be bound by arbitration, but allowed the parties to incorporate rules of arbitration into their agreement, thereby establishing the requisite consent to entry of judgment, if the rules so provided. Id., at 426. The problem in Varley was that the AAA Rules at the time of the decision made no reference to entry of judgment. Id. However, in this case the arbitration action was commenced after the Rules had been amended by the addition of Rule 46(c). The parties to the agreement are, therefore, deemed to have consented to entry of judgment on any arbitration award, as required by 9 U.S.C. § 9.
 
 
 66
 UNC's further contention that "a substantive change in the AAA Rules cannot be applied retroactively to render enforceable an arbitration award when the parties did not contract for binding arbitration" is similarly without merit. The parties specifically agreed that the AAA Rules should govern any arbitration proceedings, and Rule 1 expressly provides that the Rules "and any amendment thereof shall apply in the form obtaining at the time the arbitration is initiated". UNC clearly contracted to be bound by any amendments to the AAA Rules.
 
 IV. Refusal to Stay State Court Proceedings
 
 67
 Edison cross-appeals from that portion of the district court order refusing to stay the Illinois state court action instituted by General, Gulf, and Scallop (cross-appellees in this portion of the appeal). Edison recognizes that the Federal Arbitration Act "does not explicitly provide that a federal court must stay a state court action filed in breach of the agreement to arbitrate and raising arbitrable issues". It is contended, however, that the district court "has the power 'to protect or effectuate its judgments' under 28 U.S.C. § 2283 (1970)[20] by staying General's state court action". Edison argues (1) that the refusal to exercise that power denied effect to the Congressional purpose embodied in the Act of resolving disputes speedily through arbitration and thereby avoiding the expense and delay of litigation;[21] and (2) that "since the outcome of the state court action could only be either directly contradictory to the federal district court's order or totally redundant and useless, its continuation directly frustrates the purpose of the Act under which Edison sought relief".
 
 
 68
 Expressing reluctance to exercise the injunctive power given by § 2283 "because of the fact that interference with another court's activities does not advance the relationship between the federal and state judiciaries", the district court concluded:
 
 
 69
 "(T)here is no likelihood that this court's judgment could be considered inconsistent with the ultimate state court determination because the Illinois court is dealing with rights arising out of the Illinois Uniform Arbitration Act (Ill.Rev.Stat., ch. 10, §§ 101-123), while this court is concerned with rights which spring from a different statutory source, the Federal Arbitration Act. Consequently, there is no need to enjoin the state court proceedings since an injunction is not necessary to protect or effectuate this court's judgment."[22]
 
 
 70
 As a general rule, "where two actions involving the same cause of action are pending in a state and federal court, and are within the concurrent jurisdiction of each, both actions, in so far as they seek relief in personam, may proceed at the same time". Aetna State Bank v. Altheimer, 430 F.2d 750, 755 (7 Cir. 1970), citing Vestal, Repetitive Litigation, 45 Iowa Law Review 525, 532 (1960). See Kline v. Burke Construction Co., 260 U.S. 226, 230, 43 S.Ct. 79, 67 L.Ed. 226 (1922). The Anti-Injunction statute, 28 U.S.C. § 2283, prevents a federal court from staying state court proceedings unless one of the three exceptions specified in the statute exists. The Fifth Circuit in the case of Southern California Petroleum Corp. v. Harper, 273 F.2d 715 (5 Cir. 1960), explained the nature of § 2283:
 
 
 71
 "Section 2283 is essentially a rule of comity, and the demand . . . that a federal court interfere with state court proceedings is directed to the discretion of the federal court. This discretion should be exercised in the light of the historical reluctance of federal courts to interfere with state judicial proceedings." Id., at 718.
 
 
 72
 The section evidences confidence in state courts, "reinforced by a desire to avoid direct conflicts between state and federal courts". Amalgamated Clothing Workers of America v. Richman Bros. Co., 348 U.S. 511, 518, 75 S.Ct. 452, 457, 99 L.Ed. 600 (1955).
 
 
 73
 Although one of the exceptions to § 2283 must exist before a federal court has power to stay state court proceedings, the court has discretion to exercise that power once it exists. The power to enjoin state proceedings is discretionary, allowing the court to weigh those factors both pro and con to the issuance of a stay. While the district court might have found that the state court action would so interfere with its judgment that a stay pursuant to § 2283 was necessary to protect and effectuate that judgment, it was not required to do so. Refusal to issue the stay was within the discretion of the district court, which cannot be overturned unless clearly and prejudicially abused. Aetna State Bank v. Altheimer, supra at 757. We find no abuse of discretion.
 
 
 74
 The judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, is sitting by designation
 
 
 **
 The Honorable William J. Jameson, United States Senior District Judge for the District of Montana, is sitting by designation
 
 
 [1]
 The opinion of the district court is published at 400 F.Supp. 888 (N.D.Ill.1975)
 
 
 [2]
 Edison refused to recognize General as a proper party to the contract because Edison did not consent to the assignment to General as required by section 19 of the contract which provided: "This Contract shall not be assigned by either party without the prior written consent of the other . . . ."
 
 
 [3]
 The licensing delays were the result of a decision by the United States Court of Appeals for the District of Columbia in Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). Prior to that decision, the Atomic Energy Commission (AEC) had, pursuant to regulations issued in December, 1970, given limited consideration to environmental impact in the licensing of nuclear power plants. The Calvert Cliffs' case, however, required the AEC to implement the full scope of environmental review contemplated by the National Environmental Policy Act of 1969 in its licensing process. Id., at 1129. This increased examination of environmental issues and greater public participation in the licensing proceedings resulted in significant delays in consideration and approval of nuclear power plant licenses
 
 
 [4]
 Edison contended that General had not succeeded to the rights of GUNF under the contract because Edison had not consented to its assignment to General and that the provisions of the contract relied upon were inapplicable. Edison also argued that even if the provision were applicable, any right to terminate had been waived by the nine-and-one-half month delay in acting on Edison's notice of rescheduling of delivery dates
 
 
 [5]
 UNC was not a party in the Illinois state proceeding
 
 
 [6]
 General also sought a declaration by the court that performance of the Reload Fuel Contract was excused because of commercial impracticability under the Uniform Commercial Code
 
 
 [7]
 The grounds for Edison's motions were that the issues raised by General's complaint were arbitrable under both the arbitration clause of the contract and Section 2 of the Illinois Uniform Arbitration Act (Illinois Revised Statutes, Chapter 10, Section 102)
 
 
 [8]
 The decision entered April 28, 1976, was unreported as of the writing of this opinion
 
 
 [9]
 If the making of the agreement or the failure, neglect or refusal to perform is in issue, the court must proceed to trial
 
 
 [10]
 Appellants do not seem to challenge the applicability of the Federal Act, but merely argue that its provisions require that effect be given to the law chosen by the parties in the contract. In their reply brief appellants pose the issue in this manner: "Thus, the question on this appeal is whether the Federal Act denies enforcement of the parties' allocation of disputes between arbitrators and courts. There is no question, as Edison implies . . ., of whether the Federal Act is 'the law of Illinois' or whether its provisions apply to a contract involving interstate commerce; there is only the question of what those provisions require."
 
 
 [11]
 Section 9 of the Federal Act (9 U.S.C. § 9) allows the parties to agree upon a court to confirm an arbitration award. But if no court is agreed upon, the Federal Act governs and the federal court within the district where the award was made may, upon application by one of the parties, confirm it. 9 U.S.C. § 9; Reed & Martin, Inc. v. Westinghouse Electric Corp., 439 F.2d 1268 (2 Cir. 1971)
 
 
 [12]
 The Court noted the conflict in the circuits on the question of "severability" of arbitration clauses "from the contracts in which they are embedded", but concluded that Congress had provided "an explicit answer" in contracts "evidencing transactions in 'commerce' "
 
 
 [13]
 The opinion of the Appellate Court of Illinois, Third District, rendered in the state court proceedings, reaches the same conclusion
 
 
 [14]
 There is a dispute between the parties as to whether this issue was raised before the district court. Edison contends that it was not raised and was therefore waived. Appellants, on the other hand, correctly point out that the issue was raised in their motion to dismiss in the lower court which read in part:
 In the interest of comity and the efficient use of judicial resources and to prevent the maintenance of a diversity action in a federal court where (by virtue of the prior pending action referred to in II above), the same action could not be brought in the appropriate state court, this action by Edison should be dismissed. (Emphasis added by appellants.)
 Appellants also correctly argued that they were not required to plead the state law by section number because federal courts must take notice of the laws of every state, including those of the forum state. 5 Wright and Miller, Federal Practice & Procedure: Civil § 1253.
 
 
 [15]
 Because the suit was in federal court solely on the basis of diversity, the court applied § 48(1)(c)
 
 
 [16]
 Either a court agreed upon by the parties or, in the absence thereof, the United States court for the district in which the award was made. 9 U.S.C. § 9
 
 
 [17]
 The American Arbitration Association is hereafter referred to as the "AAA"
 
 
 [18]
 The Varley decision was relied on in Splosna Plovba of Piran v. Agrelak Steamship Corp., 381 F.Supp. 1368 (S.D.N.Y.1974), also cited by UNC. However, the Splosna case involved the failure of the plaintiff to comply with the law adopted by the parties in their agreement for confirmation of the arbitration award, rather than the failure of the parties to include a provision making the award binding. Id., at 1370
 
 
 [19]
 Rule 46 before amendment in 1973 merely provided:
 "COMMERCIAL ARBITRATION RULE 46. (1964)
 APPLICATIONS TO COURT.
 (a) No judicial proceedings by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.
 (b) The AAA is not a necessary party in judicial proceedings relating to the arbitration."
 
 
 [20]
 28 U.S.C. § 2283 reads:
 "A court in the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."
 
 
 [21]
 Citing Wilko v. Swan, 346 U.S. 427, 431, 74 S.Ct. 182, 98 L.Ed. 168 (1953); Prima Paint v. Flood & Conklin, 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); Federal Commerce & Nav. Co. v. Kanematsu-Gosho, Ltd., 457 F.2d 387, 389 (2 Cir. 1972)
 
 
 [22]
 As noted supra, subsequent to the filing of briefs and oral argument, the Illinois Appellate Court affirmed the judgment of the Circuit Court, finding that the dispute was within the scope of the arbitration clause and therefore arbitrable