**MESA OPERATING LIMITED PARTNERSHIP, Plaintiff-Appellee,**

v.

**LOUISIANA INTRASTATE GAS CORPORATION, Defendant-Appellant.**

No. 86–3128.

United States Court of Appeals,
Fifth Circuit.

Aug. 18, 1986.

Douglas C. Longman, Jr., Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., Lawrence E. Donohoe, Jr., Edward M. Doyle, Houston, Tex., for defendant-appellant.

John M. Wilson, Liskow & Lewis, George J. Domas, New Orleans, La., for plaintiff-appellee.

Before GARWOOD and JONES, Circuit Judges, and WILL *, District Judge.

* District Judge of the Northern District of Illinois, sitting by designation.

WILL, District Judge:

Opposing parties in this case contracted on June 15, 1981 for fifteen years. Mesa Operating Limited Partnership (Mesa) was to sell and Louisiana Intrastate Gas Corp. (LIG) was to buy royalty gas belonging to the State of Louisiana for which Mesa served as agent. The contract contained an arbitration provision under which the parties were to arbitrate "any controversy between the parties ... arising under this Contract." § 8.1. The contract was performed satisfactorily to both sides for about two years. Mesa alleges that some time before July, 1984 LIG ceased payments due under the take-or-pay provision of the contract. Mesa then attempted to invoke the arbitration procedure by letter of December 23, 1985. LIG refused to name an arbitrator, taking the positions (a) that Mesa had not complied with Louisiana statutory procedure in acquiring the right to sell the gas belonging to the State, rendering the contract void *ab initio*, and (b) that validity *ab initio* of a contract is not arbitrable under the applicable Louisiana law.

Mesa filed a petition to compel arbitration in the District Court for the Middle District of Louisiana under section 4 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–14, on January 14, 1986. LIG moved to dismiss on grounds of lack of federal jurisdiction under Title 28 and inapplicability of the FAA. The district court granted Mesa's petition and LIG has appealed. We affirm.

## I. Diversity Jurisdiction

■ Under the FAA, federal jurisdiction is available only if otherwise available through some independent source such as 28 U.S.C. § 1331 or § 1332. 9 U.S.C. § 4. Here diversity is the alleged basis of jurisdiction. LIG contends that the citizenship of the limited partners of a limited partnership must be alleged and considered in determining diversity jurisdiction. Since we find it unnecessary to consider the citizenship of limited partners, we conclude that it need not be ascertained.

We apply the Supreme Court's analysis in *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), affirming a decision of this court, to this case. In *Navarro*, the Court had to decide whether to look to the citizenship of the beneficiaries of a business trust or only to that of the trustees. The Court characterized the business trust as "neither an association nor a corporation," *id.* at 462, 100 S.Ct. at 1782, although having some attributes of both. *Id.* The Court held the trust's resemblance to other forms of business enterprise irrelevant to the determination of whose citizenship determined diversity jurisdiction. *Id.* at 465, 100 S.Ct. at 1784. The Court identified the correct analysis as focusing on the "real parties to the controversy." *Id.* at 462, 100 S.Ct. at 1782. These parties the Court defined as those with the power to own, manage and control the assets of the trust and to control its litigation. *Id.* at 465, 100 S.Ct. at 1784.

■ We find this reasoning equally appropriate here. A limited partnership is also neither corporation nor association but a similar hybrid. Here, as in *Navarro*, the power to control and manage assets and litigation rests exclusively with one class of members, the general partners. We think that where it is possible to identify clearly a class of members as the real party to a controversy, the citizenship of that class alone is relevant for diversity purposes.

Judge Friendly of the Second Circuit reached a similar result in *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 183–84 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). The court there found that, under the state statute creating limited partnerships, a limited partner was "not a proper party to proceedings by or against the partnership ..." unless the suit involved insolvency of the partnership or rights of the limited partners against the partnership. 358 F.2d at 183–84. Although this constitutes a parallel route to the same result, the concept of two distinct classes of members one of which has no place in the dispute is essen-

tially the same reasoning under a different label. Courts in the Second Circuit have continued to follow that decision. *Westville Holdings v. American Petroleum Partners*, 592 F.Supp. 44 (S.D.N.Y.1984).

A number of other circuits disagree. *Carlsberg Resources Corp. v. Cambria Sav. & Loan*, 554 F.2d 1254 (3d Cir.1977); *Elston Inv. Ltd v. David Altman Leasing Corp.*, 731 F.2d 436 (7th Cir.1984); *New York State Teachers Retirement System v. Kalkus*, 764 F.2d 1015 (4th Cir.1985). The leading case, *Carlsberg Resources*, opposing the holding of *Colonial Realty*, looked to traditional treatment of unincorporated associations. The court in *Carlsberg* cited two turn-of-the-century cases, *Chapman v. Barney*, 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889) and *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900). *Chapman* involved a joint stock company whose president had capacity to sue in the name of the partnership; there is no other indication that he had any other powers different from the other members. *Great Southern* involved a "limited partnership" with no general partner. In *Navarro*, the Court characterized these two cases as "early cases" in which a voluntary unincorporated association remains a "mere collection of individuals" who "sue in their collective name." 446 U.S. at 461, 100 S.Ct. at 1782. Associations thus described are clearly quite different from a limited partnership with two separate and distinct classes of members, one of which enjoys exclusive ownership of assets and control over all legal and business decisions. We do not regard *Navarro* as having endorsed application of the holdings in these early cases to the modern limited partnership as *Carlsberg* and the cases following *Carlsberg* have concluded.

The three circuits that have looked to the citizenship of limited partners for diversity purposes have also relied on *United Steelworkers v. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965), as drawing a hard line on expansion of diversity jurisdiction. But the question in *Bouligny* was whether a labor union could itself be treated as a separate citizen for diversity purposes. The case did not involve a choice as to whether two separate classes of members could be differentiated as does this case and as did *Navarro*. As we said in *Lee v. Navarro Savings Ass'n*, 597 F.2d 421 (5th Cir.1979), *aff'd*, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), we believe *Bouligny* applies only to the situation where an unincorporated association seeks to establish jurisdiction as an entity.

This is consistent with the holding in *Navarro*, where the Supreme Court found *Bouligny* inapposite. The Court cited *Bouligny* only to exemplify the difference in outcome for diversity purposes between a real party in interest test and the Court's real party to the controversy test. 446 U.S. at 462–63 n. 9, 100 S.Ct. at 1782–83 n. 9. The union in *Bouligny* did not meet the test for real party to the controversy. Like the early cases, in *Bouligny* there was no class with exclusive control based on contract (or statute) setting forth permanent rights, powers and obligations as granted to the trustees in *Navarro* and to the general partners here. Thus, district courts in New York have encountered no difficulty in applying *Colonial Realty* to limited partnerships, *Westville Holdings, supra*, while applying *Bouligny* to unions, *United States Postal Service v. American Postal Workers Union*, 564 F.Supp. 545 (S.D.N.Y. 1983).

The reasoning of the other circuits comes down to a disinclination to expand diversity jurisdiction without congressional authorization. We find that reason irrelevant to our decision. If determination of diversity jurisdiction rests on the test the Supreme Court developed in *Navarro*, diversity jurisdiction extends only to the precise parties to whom it should extend: that is, the real parties to the controversy. While this may arguably create diversity expansion, it is more semantics than principle. An attempt to create a new type of citizen would, of course, expand jurisdiction. Here we are dealing only with which already extant citizens are involved in the case; the issue

here is merely a necessary interpretation of existing law.

In *Lee,* we drew an analogy between a business trust and a limited partnership. "The trust here is analogous to a limited partnership, and the citizenship of its beneficiary shareholders should not be counted in determining the existence of diversity jurisdiction." 597 F.2d at 425. We relied on the Declaration of Trust in that case to determine that the trustees had exclusive control. The exclusive power to manage and control the trust and to control its litigation was precisely the point on which the Supreme Court affirmed. These powers were those which conferred the status of real parties to the controversy on the trustees. Despite the fact that the Court retitled our test from "real parties in interest" to "real parties to the controversy," the Court affirmed our test as we applied it. We reject the argument, made in *Elston Inv., Kalkus,* and *Trent Realty Assoc. v. First Fed. Sav. & Loan,* 657 F.2d 29 (3d Cir.1981), that the Court's characterization of a trust as neither corporation nor association rejected analogous use of this test for limited partnerships.

Before the *Navarro* decision, lower courts had frequently held citizenship of the beneficiaries of a business trust relevant to determination of diversity jurisdiction. *Belleview Apts. v. Realty ReFund [sic] Trust,* 602 F.2d 668 (4th Cir.1979); *Heck v. A.P. Ross Enterprises, Inc.,* 414 F.Supp. 971 (N.D.Ill.1976); *Chase Manhattan Mortg. & Realty Trust v. Pendley,* 405 F.Supp. 593 (D.Ga.1975). *Navarro* has clearly overruled these cases which relied on analogizing a business trust to an unincorporated association. We acknowledge that *Navarro* was expressly limited to trusts. But we see no reason not to apply its reasoning to a situation it equally fits.

The correct analogy to be drawn is not between the types of business enterprise involved, but between application of the Court's test in *Navarro* to another enterprise. The Court held the trustees the real parties to the controversy because they, and they alone among the membership, held title to the assets, managed the assets, and controlled any litigation involving the trust. Similarly, in the limited partnership here, the general partners, and they alone as against the limited partners, control and manage assets, conduct all business and control all litigation. In the absence of specific direction from the Supreme Court, we think the proper course is to apply the analysis made by the Court in *Navarro* to the facts before us.

■ Mesa's Amended and Restated Agreement of Limited Partnership, Plaintiff's exhibit 5, dated September 5, 1985, provides that the general partners have full authority without limitation to conduct all business; expend or encumber all assets; negotiate, enter into, execute and perform all contracts and conveyances; and control all matters affecting rights and obligations of the partnership, "including the conduct of litigation." § 6.1(a). In contrast, the limited partner is to take no part in operation, management or control of the partnership. § 7.2. The limited partner cannot remove the general partners, § 13.1. The limited partner can dissolve the partnership only after withdrawal of a general partner or an event which removes him. § 14.1. The limited partner can amend the agreement only with consent of the general partners where such amendment has any legal effect on the general partners; the general partners may amend without agreement of the limited partner in a number of ways. Art. XV(a), (b), (c).[1] We conclude on the

---

1. Under most state limited partnership acts and the Uniform Limited Partnership Act, limited partners have more power than the limited partner in this case does. Under Delaware law, for example, the limited partner is excluded from participation in control of the business. But the following powers are defined as not constituting participation: consulting, advising; being employed by or hired as a contractor or agent by the general partner; and voting on amendments to the partnership agreement, dissolution of the partnership, removal of the general partner, transfer of a material portion of the assets, incurrence of material indebtedness, and approving matters related to the business. 6 Del.C. § 17–303. Furthermore, the limited partner may sue in the name of the partnership if the general partner refuses or would refuse to

basis of this partnership agreement (1) that the general partners of Mesa have exclusive power to manage and control all assets, conduct all business, and control all litigation; (2) that the general partners are the real parties to the controversy; and (3) that only their citizenship is relevant to the determination of diversity jurisdiction.[2]

## II. *Applicability of the Federal Arbitration Act*

The FAA provides that a written provision in a "contract evidencing a transaction involving commerce" to arbitrate a "controversy thereafter arising out of such contract" shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2. LIG alleges that the contract between these parties did not involve commerce in that the gas did not cross state lines. LIG has submitted an affidavit containing uncontroverted testimony that the gas under the contract is produced in Louisiana waters by Mesa, transported and sold to LIG in Louisiana, and sold by LIG to Louisiana customers only. Whether or not these customers in turn sell interstate is not clear. In LIG's view, this prevents the contract from "involving commerce."

Mesa has also submitted an affidavit which contains further uncontroverted facts: under the contract and during the course of its performance, the general partners of Mesa were recognized as citizens of Texas operating in Louisiana; they sent personnel from Texas to Louisiana and received all communications related to the contract and all payments under the contract in Texas.

Citizens of different states engaged in performance of contractual operations in one of those states are engaged in a contract involving commerce under the FAA. Such a contract necessitates interstate travel of both personnel and payments. Commerce under the FAA is not limited to interstate shipment of goods, as LIG argues, but includes all contracts "relating to interstate commerce." *Prima Paint v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 401 n. 7, 87 S.Ct. 1801, 1805 n. 7, 18 L.Ed.2d 1270 (1967), quoting H.R.Rep. No. 96, 68th Congress, 1st Sess. 1 (1924). Where citizens of one state conducted all of their business in another state, the court found a contract involving interstate commerce under the FAA. *Snyder v. Smith,* 736 F.2d 409 (7th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984). Where all business under the contract took place in one state and corporations in that state were formed by the parties for the purpose, the fact that money-raising activity took place in another state brought the contract under the FAA. *Masthead MAC Drilling Corp. v. Fleck,* 549 F.Supp. 854 (S.D.N.Y.1982). Mesa similarly crosses state lines in order to engage in operations under the contract. Mesa also has raised money for the project outside Louisiana. Thus we find that this contract involves commerce under the FAA and the federal law of arbitrability applies to the arbitration provision in this contract.

The fact that the parties intended arbitration under Louisiana law does not affect the question of arbitrability. As we said in *Huber, Hunt & Nichols v. Architectural Stone Co.,* 625 F.2d 22 (5th Cir.1980), the existence of commerce under the FAA

---

do so. § 17–1001. Thus the partnership here, if formed under Delaware law—as is the case—and with no further restrictions on powers of the limited partner, might not meet the Court's test for the clear division between classes of partners on which this decision is based. We express no opinion as to whether a limited partnership agreement which granted powers to limited partners as broad as the Delaware statute permits would require the limited partners to be considered for diversity jurisdiction.

**2.** The Court suggested in *Navarro* that diversity jurisdiction should be a question capable of a simple and immediate answer. Where jurisdiction depends on citizenship of general partners and a showing that they have exclusive management and control of assets and litigation, determination of citizenship would be both faster and easier than a process of matching up long lists of members whose addresses may not even be correctly carried on the partnership's books as of the date of filing.

is dispositive with respect to the law which governs arbitrability even where the parties contemplated state law governance. *Accord Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263 (7th Cir. 1976); *Collins Radio Co. v. Ex-Cell-O Corp.*, 467 F.2d 995 (8th Cir.1972); *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209 (2d Cir.), *cert. denied*, 406 U.S. 949, 92 S.Ct. 2045, 32 L.Ed.2d 337 (1972). Furthermore, sufficient legal authority was available to the parties prior to their contract to put them on notice that the FAA would govern arbitrability of issues arising under the contract.

The affidavits conflict on whether LIG uses interstate pipelines to transport the gas under the contract. But where Congress has exercised its authority under the Commerce Clause to regulate *intrastate* shipments of gas, 15 U.S.C. § 3371(a) & (b), we may presume the commerce is under regulation by Congress. Where the price established in the contract is the amount established as the maximum lawful price by the Natural Gas Policy Act of 1978, § 6.1, we may presume the commerce is under regulation by an agency created by Congress. Unless commerce under the FAA is a narrower term, as suggested by Justice Black's dissent in *Prima Paint*, 388 U.S. at 409–10, 87 S.Ct. at 1808–09, then Congress' regulation of the price and shipping arrangements involved in this contract lead to a finding of commerce under the FAA.

### III. Application of the federal law of arbitrability to the issue of validity ab initio.

■ LIG alleges that the state Mineral Board, from which Mesa leased the production site, and Mesa had together failed to comply with La.Rev.Stat. 30:142 (West 1974), which required that the contract to sell the state's gas be approved by certain state officials or that public bid procedures be followed. LIG contends that this failure made the contract between LIG and Mesa void as never having been entered into. LIG further argues that this issue could

not, therefore, have arisen under the contract and was, therefore, not arbitrable.

The Gas Purchase Contract states that the parties agree to arbitrate "any controversy between the parties ... arising under this Contract." § 8.1. This is the same language held broad enough to encompass—as an arbitrable issue—an allegation of fraudulent inducement against the entire contract in *Prima Paint*, 388 U.S. at 398, 87 S.Ct. at 1803. *Prima Paint* held that, under section 4 of the FAA, the "making" of an agreement to arbitrate was not called into question by the allegation that the entire contract was fraudulently induced. Therefore, the Court concluded, the fraudulent inducement question was properly resolved by an arbitrator rather than a court. *Id.* at 403–04, 87 S.Ct. at 1805–06. Similarly, in this case, LIG has not argued that the agreement to arbitrate is invalid separately from the entire contract. Thus the arbitration provision remains separate and enforceable under *Prima Paint*.

This case is very close factually to *Prima Paint*. There, the defendant had represented itself as able to perform under the contract though in fact it was unable to do so. Here, Mesa warranted title to the gas and offered indemnification for adverse claims to title. § 7.1. Even if LIG's allegation is correct, the worst result of the defect in the contract would be Mesa's inability to perform. This was precisely the factual situation referred to arbitration in *Prima Paint*.

■ We find the issue raised by LIG separable from the arbitration agreement on a further ground. A regulatory agency has its own duty to enforce its own procedures; it is free to pursue its own remedies and is not bound by the arbitration results of parties to a contract involving those regulations. *Gulf Oil Corp. v. Federal Power Comm'n*, 563 F.2d 588 (3d Cir.1977), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). There is no reason, therefore, for the parties' arbitration to be hindered by the duties or claims of the regulatory agency. Under the arbitration

provision, the arbitrators must be qualified by education and experience to deal with the disputed issue. § 8.3. Since the validity issue in dispute here involves claims of the state, the parties should select arbitrators who can pass on that question.

The legislative purpose of the FAA, consistently interpreted as such by the Supreme Court, is to enforce arbitration clauses as liberally and rigorously as possible. "Contracts to arbitrate are not to be avoided by allowing one party to ignore the contract and resort to the courts." *Southland Corp. v. Keating*, 465 U.S. 1, 7, 104 S.Ct. 852, 856, 79 L.Ed.2d 1 (1984); *see also Graphic Communications Union v. Chicago Tribune Co.*, 779 F.2d 13 (7th Cir. 1985), in which the court vigorously criticized resort to courts to delay clearly contracted arbitration. To allow the tactic attempted here—irrelevant both to the freely agreed arbitration provision and to the true issue between the parties—would be to undermine the long-standing policy of liberal and vigorous enforcement of arbitration clauses and to permit such clauses to be used as vehicles for delaying the resolution of disputes rather than expediting it. This would inevitably lead to abandonment of their use, a result highly undesirable and inconsistent with current efforts to broaden alternative means of dispute resolution.

Affirmed.