BRANDON, JONES, SANDALL, ZEIDE, KOHN, CHALAL & MUSSO, P.A., d/b/a Orthopedic Center of Palm Beach County, a Florida Corporation, Plaintiff,

v.

MedPARTNERS, INC., a Delaware Corporation; MedPartners Acquisition Corporation, a Delaware Corporation; and MedPartners Physician Management, L.P., a Delaware Corporation; J. Michael Burman, Esq.; Stanley Gottsegen, Esq.; and Sheldon Engelhard, Esq., Defendants.

No. 99–8624–CIV.

United States District Court, S.D. Florida.

Sept. 20, 2001.

Robert M. Montgomery, Jr., Montgomery & Larmoyeux, West Palm Beach, FL, James Wallace Beasley, Jr., Robert Jeffrey Hauser, Beasley & Hauser, West Palm Beach, FL, for plaintiff.

Eric Franz, Stephen J. Bumgarner, Joseph W. Letzer, D. Frank Davis, Burr & Forman, Birmingham, AL, James D. Tittle, Jr., Glenn Tittle & Kairalla, West Palm Beach, FL, for MedPartners, Inc., MedPartners Acquisition, MedPartners Physician Management, L.P.

## *OMNIBUS ORDER*

MIDDLEBROOKS, District Judge.

THIS CAUSE came before the Court on a series of related motions, including Plaintiff Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A.'s ("Orthopedic Center") Renewed Motion with Memorandum in Support to Compel Arbitration, for Attorneys' Fees, and for Other Relief (D.E.# 49) pursuant to the Florida and Federal Arbitration Acts, Defendants' Motion to Excuse Arbitration Panel, filed August 6, 2001 (DE# 58), and Defendants' ("MedPartners") Renewed Motion to Dismiss, filed August 6, 2001 (DE# 55). This Court heard oral argument on the motions on August 13, 2001, and these matters are now ripe for disposition.

### I. Factual Background and Procedural History

#### A. *The Dispute*

In 1994, the Orthopedic Center and MedPartners entered into a twenty-year clinic services management agreement ("Agreement") under which the doctors comprising the Orthopedic Center contracted with Med-

Partners to manage their practice. Pursuant to the Agreement, MedPartners collects revenue on behalf of the Orthopedic Center and distributes a portion of the collected revenue back to the Orthopedic Center as compensation. In this suit, several provisions of the Agreement are at issue: first, a compensation provision establishing a guaranteed minimum level of compensation; and finally, two related provisions requiring the arbitration of certain disputes between the parties. The compensation provision guarantees a minimum level of compensation to the Orthopedic Center so long as the Center's doctors retain a substantially equivalent level of industry as when the practice was first acquired in 1994. The guaranteed minimum level of compensation is $5.35 million per year, or $445,833 per month.

The contract also contains two independent arbitration clauses in sections G and 6.2 that require arbitration to resolve disputes over the amounts of payments "due" and allegations of a "breach of contract," after one side has given the other side notice and an opportunity to cure. Section G reads as follows:

G. Acceptance of Interim Payments Not Waiver of Balance Due

It is expressly understood and agreed that provisions in this Agreement for the payment by MEDPARTNERS of sums in payment of overdue amounts do not constitute, and shall not be construed or interpreted as constituting or implying, an agreement to accept such sums in full payment of, of settlement for, amounts due. In the event of a dispute as to what amount is owed by MEDPARTNERS in any situation where a payment is due, including but not limited to monthly payments, the matter shall be resolved by binding arbitration under the auspices of the American Arbitration Association, before three arbitrators, with the arbitration fee equally split between the parties, who shall otherwise hear their own respective fees and costs. However, the losing party (as defined hereinbelow) in each instance of arbitration shall pay the fees and costs of the prevailing party, which fees and costs shall be determined by the same panel of arbitrators at a hearing to be held

not later than three (3) weeks after the date of the arbitrators' majority decision on the issue(s) in dispute. Within ten (10) days from the date said payment is due, each side shall select and gain the commitment to participate of one arbitrator, and those two arbitrators shall select a third; arbitration shall be held within three weeks of the date the payment was due, in Palm Beach County, Florida. The decision of the majority of the arbitrators shall be binding. Within five (5) days of the date of the arbitrators' decision, MEDPARTNERS shall pay to the P.A. the entire amount which the arbitrators have determined is due, with interest at 18% per annum from the due date. Once that procedure is followed and MEDPARTNERS pays in full the amount determined to be due, with interest, the dispute as to said amount shall be deemed fully resolved; in such event, the P.A. shall upon demand of MEDPARTNERS, following the P.A.'s receipt of said funds, provide MEDPARTNERS with a release describing the nature of the payments involved, the period of time involved, and acknowledging that said matter is settled. For purposes of the foregoing, if a majority of the Arbitrators rules (a) that one party owes the other party more than $50,000, the first party shall be deemed "the losing party;" or (b) that there has been a breach of this Agreement sufficient to justify termination by the complaining party, said party shall be deemed "the losing party."

Section 6.2(c) states:

*(c) Termination by MEDPARTNERS for Alleged Lack of Industry*

In order to invoke this provision for termination, MEDPARTNERS must demonstrate that the then-current Physician Shareholders and Physician P.A. Employees, taken as a group, are not complying with their obligations of industry as defined in Section 5.1(a) and as further amplified by illustration in Exhibit B hereto following receipt of a detailed notice of breach on this ground, setting forth the physicians involved and detailing the particulars of why the P.A. taken as a group is thus not complying with said obligations of industry; the P.A. will have six (6) months

from receipts of said notice within which to cure the alleged breach; if at the end of said six months, MEDPARTNERS maintains that the then-current activity of the group still does not comply with the obligations of industry defined in Section 5.1(a), the provisions of Section 6.2(d)(i) below shall apply. In the event that a majority of the arbitrators rules against MEDPARTNERS, the provisions of Section 6.2(d)(ii) below shall apply; in the event that a majority of the arbitrators rules against the P.A, the provisions of Sub-paragraphs 6.2(d)(iii)(A) through (d)(iii)(D), inclusive will apply:

. . .

(d)(i) If either party informs the other in writing that in its opinion, the other party has breached the contract, the alleged breaching party will have the period indicated above from the date of receipt of said writing to cure the breach or demonstrate why no breach has occurred. If the first party still maintains there is a breach on the same grounds, it shall serve a written demand for arbitration upon the alleged breaching party. The matter. shall be resolved by binding arbitration under the auspices of the American Arbitration Association, with the arbitration fee equally split between the parties, who shall otherwise bear their own respective fees and costs. Within fifteen (15) days from the date of the alleged breaching party's receipt of the first party's written demand for arbitration, each side shall select and gain the commitment to participate of one arbitrator, and those two arbitrators shall select a third; arbitration shall be held within three weeks thereafter, in Palm Beach County, Florida. The Clinic Services Agreement, as amended, would remain in full force and effect until the arbitrators reached a decision. The decision of the majority of the arbitrators shall be binding.

In May 1999, a dispute arose between the parties. The Orthopedic Center alleges that in a May 13, 1999 letter MedPartners accused the Center's doctors of a "lack of industry," and announced that it intended to terminate the entire agreement in six months. The Orthopedic Center claims that the April 1999 payment made to the Orthopedic Center on May 15, 1999 was $277,240 less than required by the Agreement. The Orthopedic Center also contends that MedPartners unilaterally has withheld an amount averaging about two hundred thousand dollars each month since April 1999. As a result, the Orthopedic Center claims that MedPartners owes it about $5.8 million past due as of July 15, 2001. On May 21, 1999, pursuant to Section G of the Agreement, the Orthopedic Center submitted a claim for arbitration to the American Arbitration Association ("AAA") and served an arbitration demand on MedPartners based on MedPartners' unilateral reduction of the Center's compensation for April 1999. MedPartners agreed to arbitrate this dispute. However, on June 24, 1999, after a second month's payment had been unilaterally reduce by $277,278, the Orthopedic Center served an amended demand for arbitration that added a claim for anticipatory breach of contract. At that time, the Orthopedic Center sought $554,518 in back compensation for April and May 1999, plus future damages for anticipatory breach, calculated over the then-remaining fourteen years of the management agreement—a total of over $40,000,000.[1] MedPartners then moved to strike this amended claim. On July 14, 1999, the Arbitrators held a hearing on MedPartners' motion, and determined that the amended claim would be heard.

1. In support of its anticipatory breach claim, the Orthopedic Center contends that the reasons given for terminating the guaranteed minimum annual compensation are pretextual and false. The Center notes that MedPartners has not, in good faith, identified a default by the practice, but rather is implementing a corporate plan to entirely divest MedPartners of its physician practice management (PPM) business. The Center points to language in MedPartners' 10K form for 1998 that openly refers to its PPM business (including its contractual obligations to the Orthopedic Center) as "discontinued operations." The Orthopedic Center alleges that as a result of this anticipatory breach it is entitled to the unpaid compensation for April, 1999, May, 1999, and future damages constituting the total expected value of the guaranteed minimum annual compensation owed to the Orthopedic Center under the remaining term of the Agreement.

## B. *MedPartners' Litigation*

Five days later, on July 19, 1999, MedPartners sued the AAA in Jefferson County Circuit Court in Birmingham, Alabama, and obtained an emergency *ex parte* restraining order against the AAA. The injunction prohibited the AAA from arbitrating any claim involving the parties except for the dispute over the April 1999 payment. The AAA did not appear or defend the lawsuit, taking the position that it was not properly a party to such a lawsuit. On July 20, 1999, MedPartners also filed a fraud and breach of contract suit against the Orthopedic Center in the District Court of the Northern District of Alabama. In pertinent part, MedPartners alleged that the Orthopedic Center had breached its contract and defrauded MedPartners by failing to meet its industry and diligence obligations under the Agreement. On July 29, 1999, the Orthopedic Center moved to dismiss, transfer, or stay that action in favor of arbitration.

On July 28, 1999, with no opposition present, a hearing was held before the same Alabama state court judge who had entered the *ex parte* July 19, 1999 temporary restraining order. The hearing was converted into a "final" trial on the merits. The AAA had not been served with process in this action or notice that the final trial would be held that day, but had received a copy of the TRO order which included the date of the hearing. By this time in late July, the April, May, and June payments to the Orthopedic Center were past due, and all future payments had been allegedly repudiated. Nevertheless, that same day, the state court entered a "permanent injunction" prohibiting the AAA from hearing any matters other than the dispute over the April 1999 payment.[2] At the time, the Orthopedic Center was still not a named party to those proceedings.

On August 9, 1999, the Arbitrators held a preliminary hearing wherein they extensively debated their rights and obligations as arbitrators in light of the state court injunction against the AAA. MedPartners and its selected non-neutral arbitrator contended that the state court injunction against the AAA also extended to the three-person arbitration panel which included Mr. Burman, the Center's selected non-neutral arbitrator, and Mr. Engelhard, the neutral arbitrator consented to by both parties. However, Mr. Burman and Mr. Engelhard concluded that because they were not employed by the AAA or under the control of the AAA, and because they were not named in the Alabama proceedings, they were free to arbitrate the amended claim. They noted that the state court injunction was directed solely to the AAA and was not directed to persons acting in concert with the AAA. Further, at the hearing, the Orthopedic Center claimed that a further delay of the arbitration would cause substantial prejudice to the Orthopedic Center since MedPartners allegedly was close to bankruptcy. The Orthopedic Center had concluded from a study of MedPartners' SEC filings that the company had lost $1.3 billion in the previous year, 1998, and had a net worth of negative $1.25 billion but still chose to pay out $14.3 million to insiders as executive compensation in 1998, exclusive of stock options. The Orthopedic Center also alleged that to extort a settlement, MedPartners had threatened to transfer the Orthopedic Center's management agreement to a "shell" subsidiary, and bankrupt the shell. On August 11, 1999, Arbitrators Burman and Engelhard voted to proceed with the arbitration, even if the AAA was itself unable to be involved due to the injunction. On August 12, 1999, the AAA prepared a letter memorializing the decision of the panel majority. The arbitration hearing was postponed by two days to August 18, 1999. On August 12, 1999, MedPartners obtained an order to show cause from the Alabama state court as to why the arbitrators should not be held in civil contempt. The AAA retained local counsel and removed the case to the Northern District of Alabama. The Honorable

---

2. The injunction, in pertinent part, provides that the AAA is "permanently enjoined" from "conducting any further arbitration proceedings between MedPartners and the P.A. except for the calculation of the April 1999 payment due." It also provides that "the sole issue to be decided in the arbitration proceedings between MedPartners and the P.A. is the calculation of the amount of the April 1999 compensation due the P.A."

U.W. Clemon immediately considered the motion and denied it as premature since the Arbitrators had not violated the injunction as of yet.

On August 18, 1999, the Arbitrators began the final hearing on the merits in West Palm Beach, Florida. After a discussion of the injunction, the Arbitrators determined that the injunction against the AAA did not bind the Arbitrators themselves. No one from the AAA attended the arbitration hearing. That same day, MedPartners filed a motion for contempt before Judge Clemon, arguing that because of Mssrs. Engelhard's and Burman's votes, the AAA as well as Mssrs. Burman and Engelhard were in contempt of the Jefferson County Circuit Court. Judge Clemon then ordered a halt to the arbitration in Florida, and ordered Mssrs. Burman and Engelhard to travel to Birmingham, Alabama for contempt proceedings scheduled for the following day. On August 19, 1999, Judge Clemon heard MedPartners' motion for contempt, and the AAA's corresponding motion to dissolve the injunction. Based on the transcript of those proceedings, it appears that Judge Clemon did not understand that Mssrs. Engelhard and Burman were not agents of the AAA, were not under the control of the AAA, and not otherwise subject to the *in personam* jurisdiction of that court, and, in any event, were entitled to arbitral immunity. Judge Clemon ordered that Mssrs. Burman and Engelhard were in contempt of the state court order and ordered them to not to conduct the required arbitration until further order. They also were ordered to pay a monetary sanction in the form of attorneys' fees to MedPartners. Mssrs. Burman and Engelhard filed an appeal to the United States Court of Appeals for the Eleventh Circuit, but since the fee had not been liquidated (and still has not been liquidated) the appeal was dismissed due to a lack of appellate jurisdiction.

On August 25, 1999, MedPartners finally added the Orthopedic Center as a party/defendant and the case was consolidated with the other federal action in the Northern District of Alabama. On September 15, 1999, the Orthopedic Center filed an emergency motion in the Northern District of Alabama to dissolve the injunction against the AAA in state court case, and to require an injunction bond. The Orthopedic Center also moved to dismiss or transfer the litigation from Alabama to Florida. Approximately one year went by, but Judge Clemon held no hearings and entered no orders, and the injunction remained in place. As a result, on September 8, 2000, the Orthopedic Center filed an appeal with the Eleventh Circuit arguing that the district court's inaction amounted to an effective denial of its motions.

## C. *History of this Action*

The Orthopedic Center filed the instant lawsuit in the Fifteenth Judicial Circuit Court, Palm Beach County, on July 23, 1999 to compel MedPartners to arbitrate. Two days before a scheduled hearing to compel arbitration, MedPartners removed the case to this Court. The Orthopedic Center moved this Court to remand, or alternatively, to compel arbitration and enjoin the foreign litigation. This Court dismissed the action on November 10, 1999, holding that the Orthopedic Center was bound by the Jefferson County injunction against the AAA, even though it was not a party to the action. The Orthopedic Center appealed this ruling to the Eleventh Circuit. On April 17, 2001, in Case No. 00–11946, the Eleventh Circuit reversed my order dismissing the Orthopedic Center's complaint to compel arbitration and remanded for further proceedings. In so doing, the Eleventh Circuit held that the Orthopedic Center was not bound by the Alabama injunction against AAA because the Center was not named as a party and had no legal duty to intervene in the case in order to avoid issue preclusion in a subsequent suit. This decision is now final and the mandate has been issued.

In addition, on April 30, 2001, the Eleventh Circuit also entered a decision in the previously-discussed federal suit initiated by Med-Partners in the Northern District of Alabama. In that decision, 00–14773, the Court of Appeals did not address the district court's refusal to rule on the Orthopedic Center's motions to dissolve the injunction or dismiss or stay the case in favor of arbitration. However, the Court of Appeals did order

that the case be transferred to the Southern District of Florida so that it could be consolidated with the instant companion case. MedPartners' subsequent motion for rehearing en banc was denied. On July 6, 2001, the mandate was issued. Accordingly, the entire case is now before this Court.

### D. Pending Motions

On July 24, 2001, the Orthopedic Center filed an Amended Complaint and a renewed motion to compel arbitration. In response, MedPartners moved to dismiss the Amended Complaint and to excuse the AAA arbitration panel. The Orthopedic Center also asks this Court to dissolve the Alabama state court injunction *ab initio* now that the companion case has been transferred properly to this Court. According to the Orthopedic Center, during the two year delay of the arbitration occasioned by the litigation, MedPartners has withheld approximately $5.8 million dollars due to the Orthopedic Center. The Orthopedic Center has appended to its renewed motion the timely filed amendments to its claims to add each deficient monthly payment as it has come due. The Orthopedic Center also seeks to prevent the termination of the management agreement. Because of the *ex parte* Alabama injunction still in effect, the AAA has been unable to proceed with the arbitration.

## II. Legal Analysis

### A. Motion to Compel Arbitration

Plaintiff moves for arbitration pursuant to 9 U.S.C. § 4[3] and Section 682.03(1) of the Florida Statutes.[4] Both sides agree that arbitration is appropriate over the disputed April 1999 payment pursuant to the Agreement between them. However, MedPartners objects to the arbitration of the Center's "anticipatory breach" claim, arguing that this claim goes beyond the scope of the arbitration provisions in the Agreement. The arbitrators already have considered this very question and concluded that the Agreement gives the Arbitrators the power to arbitrate Plaintiff's anticipatory breach claim. MedPartners argues that under *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995), this Court, and not the Arbitrators, must determine whether a dispute is arbitrable in the first place—unless there is clear and unmistakable evidence that the parties agreed to allow the Arbitrators to make such arbitrability determinations. For the following reasons, I conclude that arbitration is warranted over the anticipatory breach claim as well as the disputed payments claims.

The question of whether the parties have agreed to allow arbitrators to decide the issue of arbitrability is essentially a question of contract law in which federal courts apply ordinary state-law · contract principles. *See Scott v. Prudential Secs., Inc.,* 141 F.3d 1007, 1011 (11th Cir.1998); *Goldberg v. Bear, Stearns & Co., Inc.,* 912 F.2d 1418 (11th Cir.1990). Under Florida law, courts are to interpret a contract so as to give effect to the intent of the parties. *See Scott,* 141 F.3d at 1012; *see also Mayflower Corp. v. Davis,* 655 So.2d 1134, 1137 (Fla. 1st DCA 1994). It is

---

**3.** This provision states:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement..... The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.....

**4.** This provision reads:

A party to an agreement or provision for arbitration subject to this law claiming the neglect or refusal of another party thereto to comply therewith may make application to the court for an order directing the parties to proceed with arbitration in accordance with the terms thereof. If the court is satisfied that no substantial issue exists as to the making of the agreement or provision, it shall grant the application. If the court shall find that a substantial issue is raised as to the making of the agreement or provision, it shall summarily hear and determine the issue and, according to its determination, shall grant or deny the application.

therefore important to examine the Agreement itself. It is undisputed here that the relevant arbitration provisions of the Agreement mandate that any arbitration shall be conducted by the AAA under its auspices. Rule 1 of the AAA's Commercial Arbitration Rules provides that "[t]he parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA).... These rules *and any amendment of them* shall apply in the form obtaining *at the time the demand for arbitration or submission agreement is received by the AAA.*" (emphasis supplied). Federal Courts interpreting Rule 1 consistently have held that "[a] party who contracts to arbitration before the AAA also consents to be bound by the procedural rules of the AAA, unless that party indicates otherwise in the contract." *P & P Indus., Inc. v. Sutter Corp.*, 179 F.3d 861, 867–68 (10th Cir.1999); *see also Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1273 (7th Cir.1976) (stating that "[t]he parties specifically agreed that the AAA Rules should govern any arbitration proceedings, and Rule 1 expressly provides that the Rules 'and any amendment thereof shall apply in the form obtaining at the time the arbitration is initiated.' UNC clearly contracted to be bound by any amendments to the AAA Rules."). This arbitration was initiated in May of 1999. Accordingly, pursuant to Rule 1, which has been the same at all relevant times, the 1999 version of the AAA Rules apply to this dispute.

■ Under the 1999 Rules, the Arbitrators had the power to determine the scope of the arbitration agreement. Rule 8 entitled "Jurisdiction" reads as follows:

(a) The arbitrator *shall have the power to rule on his or her own jurisdiction,* including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine *the existence or validity of a contract* of which an arbitration clause forms a part.

. . .

(c) A party must object to the jurisdiction of the arbitrator or to the arbitratability of a claim or counterclaim no later than the filing of the answering statement ... The arbitrator *may rule on such objections as a preliminary matter or as part of the final award.*

*Id.* (emphasis added). According to the AAA's Summary of the 1999 Rules,

Section R–8 is designed to make explicit in the rules generally accepted principles of arbitral jurisdiction. By adopting these rules, parties agree to the arbitrability of such jurisdictional disputes.... Subsection (a) specifically states that the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.... Subsection (b) authorizes the arbitrator to determine the existence or validity of a contract of which an arbitration clause forms a part.... Subsection (c) is simply intended to clarify when such jurisdictional challenges are to be filed and that the arbitrator may rule on such objections...

*Id.* The plain language of Rule 8 makes it quite clear that AAA arbitrators are authorized to decide questions of arbitral jurisdiction.

MedPartners' only response is to argue that the 1999 version of Rule 8 does not apply here because the Agreement was forged in 1996 and not 1999. This argument is without merit. As quoted above, Rule 1 of the AAA, which was operative in 1996 at the time of the Agreement, states "[t]hese rules *and any amendment of them* shall apply in the form obtaining *at the time the demand for arbitration or submission agreement is received by the AAA*" (emphasis added). If MedPartners had wanted to carve out this provision so that it would not operate to validate any subsequent amendments to the AAA's rules, it could have done so rather easily using everyday contract language. However, MedPartners did not do so. Clearly, Rule 1 directs that the 1999 version of Rule 8 applies to this suit as the demand for arbitration was made in 1999. Because the parties contemplated arbitration by the AAA

in its arbitration provisions, the Agreement incorporated the procedural rules of the AAA as explained in those Rules. *See Commonwealth*, 541 F.2d at 1273. Again, the parties could have contracted around Rule 1 of the AAA if they so chose. However, by designating the AAA in the Agreement to arbitrate any dispute and not designating any alternate set of procedural rules or expressing any limitation on the applicability of the Rule 1, which was in effect at the time of the Agreement, the parties contracted via a theory of incorporation that the Rules of the AAA would govern arbitration matters. *See P & P Indus.*, 179 F.3d at 867–68 (finding that "[a] party who consents by contract to arbitration before the AAA also consents to be bound by the procedural rules of the AAA, unless that party indicates otherwise in the contract. By agreeing to arbitrate before the AAA, and by not specifying an alternative set of arbitration rules in the agreement, P & P and Sutter impliedly agreed that they would be bound, in the course of arbitration proceedings, by the procedural rules of the AAA."). I find that these facts provide clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. Under Rules 1 and 8, the Arbitrators have the authority over arbitrability determinations and other jurisdictional questions.[5]

■ Moreover, even if I were to consider the merits of the arbitrability question, I would come to the same conclusion as the Arbitrators. Section G of the management agreement calls for arbitration of any dispute over *any* payments "owed" or "due," *including but not limited to* monthly payments. Section G does not, by its plain terms, exclude from arbitration other debts "due" or "owed" between the parties, such as debts arising from an alleged breach of the agreement. Section 6.2(c) similarly requires MedPartners to initiate an arbitration in order to terminate the contract for lack of industry. In my view, assuming the Orthopedic Center's allegations in the Amended Complaint

to be true, MedPartners triggered section 6.2(c) and (d) when it accused the Orthopedic Center of lack of industry, stopped paying monthly guaranteed minimum wage payments, threatened unilateral termination of the contract in six months, and sued the Orthopedic Center for fraud and breach of contract. The plain text of section 6.2(d) clearly requires arbitration of *any* allegations of "breach of contract." *See* Mgmt. Agreement, § 6.2(d) ("The [allegations of breach] shall be resolved by binding arbitration...."). In addition, it is undisputed that Florida law gives the Orthopedic Center an immediate right to claim damages owed for anticipatory breach of contract under the pled allegations.

In response, MedPartners offers a fairly technical argument. MedPartners reads the relevant provisions of the Agreement narrowly to suggest that none of the cited provisions allows for the arbitration of an anticipatory breach claim. It first observes that Section G only covers disputes over payments owed or due and not future-oriented payments. Of course, what payments are owed or due Plaintiff is a question very much in dispute between the parties, and one that goes to the merits of Plaintiff's claims. If Plaintiff is right on the merits of its allegations and Defendants' behavior constitutes an anticipatory breach of the entire contract, then all contracted-for monthly payments would be owed/due, or so it would seem. MedPartners also argues that since it never formally sought "termination" of the contract through arbitration, Section 6.2(c) and (d) are not applicable. In its view, termination of the Agreement is governed solely by the terms of Section 6.2(k). However, despite the fact that MedPartners has not sought arbitration to terminate the contract, MedPartners in its May 1999 letter to Plaintiff did state specifically that it was repudiating the guaranteed minimum compensation clause, and would terminate the contract within six months per the terms of Section

---

5. Federal courts are obligated to give arbitrators' decisions regarding the arbitrability of a matter the same deference due an arbitrators' decisions on the merits. *See, e.g., First Options*, 514 U.S. at 943, 115 S.Ct. 1920 (stating that where the parties agreed to submit the arbitrability ques-

tion to the arbitrator, "the court should give considerable leeway to the arbitrator"); *GK MGT Inc. v. Local 274, Hotel Employees and Restaurant Employees Union, AFL—CIO*, 930 F.2d 301, 304 (3d Cir.1991).

6.2 on the grounds that Plaintiff had breached the contract through a lack of industry. On this same basis, a lack of industry, MedPartners has continued to withhold monthly guaranteed minimum compensation payments from Plaintiff. Termination of the contract is therefore very much at issue, and Section G applies.

■ This conclusion concerning the scope of the Arbitrators' authority to hear the anticipatory breach claim is well-supported under the caselaw. Arbitrators have the authority to remedy a breach (anticipatory or otherwise) of contract in any way reasonably related to the contract terms, including money damages or even specific performance. *See United Ass'n of Journeymen & Apprentices v. Ross Bros. Construction Co.*, 191 F.3d 714, 718 (6th Cir.1999) (holding that "[a]rbitrators are considered to have the authority to award monetary damages for contract violations even though the contract does not specifically provide such remedy ... [T]he authority of an arbitrator to award damages is as truly and integrally a part of the contract as if it were written there in unmistakable English and boldface type."); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60–62, 115 S.Ct. 1212, 1217–19, 131 L.Ed.2d 76 (1995) (finding that arbitration agreement did not include "an unequivocal exclusion of punitive damages claims" and therefore punitive damages could be awarded in arbitration); *Totem Marine Tug & Barge, Inc. v. North Amer. Towing, Inc.*, 607 F.2d 649, 651 (5th Cir.1979) (stating that "arbitrators enjoy a broad grant of authority to fashion remedies" so long as they act on those issues subject to arbitration); *Minute Maid Co. v. Citrus, Cannery, Food Processing and Allied Workers, Drivers, Warehousemen and Helpers, Local Union No. 444*, 331 F.2d 280, 281 (5th Cir.1964) (affirming award of money damages for back pay·even though this specific remedy was not mentioned in the contract). In addition, any doubts about the scope of an arbitration clause should be resolved in favor of arbitration under federal law. *See AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see also Federal Vending, Inc. v.*

*Steak & Ale,* 687 So.2d 1366, 1367 (Fla. 4th DCA 1997).

■ Further, under Florida law, the Orthopedic Center was not only entitled, but obligated, to seek adjudication of all damages from MedPartners' conduct in a single proceeding. All of the Orthopedic Center's alleged damages arise from a single act— MedPartners' alleged renunciation of the guaranty minimum compensation clause (through correspondence dated April 15, 1999 and again on May 13, 1999), threatened termination of the contract, and resulting refusal to pay the Orthopedic Center every month under the terms of the contract for two years. Where a single breach of contract leads to continuing damages, the plaintiff must claim and seek the entire amount of damages suffered in a single proceeding. *See National Educ. Ctrs. v. Kirkland,* 635 So.2d 33, 34 (Fla. 4th DCA 1993) (on rehearing) (stating that "[i]f the damages are only new damages resulting from the original cause of action, all the damages arising from the breach must be recovered in a single action.... This is also generally true in the case of an anticipatory breach, as where one party incapacitates himself from performance or unequivocally refuses to perform."). Under *Kirkland,* the Orthopedic Center's cause of action has accrued, and the entire amount of contract damages is "due" and "owed." The anticipatory breach claim is therefore within the arbitration clause and complies with Florida law on the recovery of damages. To conclude otherwise would allow MedPartners to avoid arbitration simply through artful pleading and would seem to require a separate arbitration each month for the twelve remaining years on the life of the contract.

### B. *Motion to Excuse the Arbitration Panel*

MedPartners now seeks to excuse the two remaining panel members, Mr. Burman and Mr. Engelhard. Mr. Burman was the nonneutral arbitrator selected by Plaintiff and Mr. Engelhard was the neutral arbitrator selected by both sides. MedPartners' nonneutral arbitrator previously resigned. MedPartners contends that because of the injunction issued by the Alabama state court and

the ensuing contempt order issued by the federal district court in Alabama against these arbitrators, the arbitrators must be excused on grounds of actual or perceived bias. MedPartners also suggests that it was inappropriate for Mr. Burman to inform Mr. Engelhard of MedPartners' financial status at the arbitration hearing. I decline to grant the motion at this time.

■ First, under the Federal Arbitration Act, interlocutory review of an arbitrator's qualifications or alleged bias does not seem to be available. Instead, such reviews are confined under the statute to judicial decisions to confirm, modify, or vacate an arbitration award *after* a final arbitration decision has been made. *See* 9 U.S.C. §§ 10(a)(1)–(3); *ANR Coal Co., Inc. v. Cogentrix of North Carolina, Inc.*, 173 F.3d 493, 497 (4th Cir.1999); *Folse v. Richard Wolf Med. Instr. Corp.*, 56 F.3d 603, 605 (5th Cir.1995) ("By its own terms, § 10 [of the FAA] authorizes court action only after a final award is made by the arbitrator."); *Sanko S.S. Co. v. Cook Industries, Inc.*, 495 F.2d 1260, 1264 n. 4 (2d Cir.1973); *Diemaco v. Colt's M'fring Co.*, 11 F.Supp.2d 228, 231–32 (D.Conn.1998) (explaining that "[t]he issue is whether a district court has authority to review an AAA procedural or interlocutory decision.... Generally, parties to an ongoing arbitration must await award before seeking judicial review."); *Marc Rich & Co. v. Transmarine Seaways Corp.*, 443 F.Supp. 386, 387–88 n. 3 (S.D.N.Y.1978) (observing that "[n]o section of the [Federal Arbitration] Act ... provides for judicial scrutiny of an arbitrator's qualifications in any proceeding other than an action to confirm or vacate an award").

Further, even if under the circumstances interlocutory review of this sort were appropriate, I would not excuse these arbitrators on the merits of MedPartners' arguments. As explained *infra*, I am dissolving the injunction against these arbitrators entered by the Alabama state court judge—mooting MedPartners' claims that the injunction and the subsequent contempt ruling, along with the concomitant possibility of pecuniary fines against Mr. Burman, create an appearance of partiality or bias. Moreover, I find no basis for removing these arbitrators for bias or dishonesty or any other improper conduct pursuant to Section 10 of the Federal Arbitration Act, 9 U.S.C. § 10. Mr. Burman as a non-neutral arbitrator is not prevented from being partisan so long as he is not dishonest in carrying out his arbitration duties. *See Lozano v. Maryland Casualty Co.*, 850 F.2d 1470, 1472 (11th Cir.1988) ("An arbitrator appointed by a party is a partisan only one step removed from the controversy and need not be impartial"), *citing Lee v. Marcus*, 396 So.2d 208, 209 (Fla. 3d DCA 1981). There is no evidence that Mr. Burman's communications as to MedPartners' financial difficulties were dishonest.[6] Allegations of dishonesty and bias are serious charges requiring probative, persuasive evidence. On the present record, I find no credible evidence that would support such a conclusion of dishonesty or impermissible partiality.[7] Finally, having dissolved the injunction, I find no good cause to excuse the neutral arbitrator, Mr. Engelhard.

C. *Request to Dissolve the State Court Injunction*

■ Plaintiff asks this Court to dissolve the injunction *ab initio* entered in the Northern District of Alabama companion case to this litigation, *MedPartners et al. v. Brandon Jones*, 99–1862–CIV, recently transferred to this Court, 01–8747–CIV–MIDDLE-BROOKS, as a result of the Eleventh Circuit's April 2001 decision. This case is the successor to *MedPartners v. AAA*, in which a state court injunction was issued against the AAA. That case subsequently was removed

---

6. It is also worth noting that Mr. Engelhard, the neutral arbitrator, described Mr. Burman's reference to the financial status of MedPartners as "just a peripheral question that came up." MedPartners' Mot. to Excuse Arb. Panel, Ex. A p. 41.

7. While MedPartners also obliquely charges Mr. Burman with violating Canon III of the AAA (without substantiating the charge through spe-

cific evidence), it is worth mentioning that the Preamble of the Code of the AAA specifically states that this Canon "does not form part of the arbitration rules of the [AAA]" and "does not establish new or additional grounds for judicial review of arbitration awards." *See ANR Coal*, 173 F.3d at 497.

to federal court and consolidated into 99–1862–CIV. The Orthopedic Center argues that it is entitled to dissolution of the *ex parte* injunction issued against the AAA *ab initio*, and that the action should be dismissed with prejudice. After reviewing the submissions of counsel and the caselaw, this Court agrees that the injunction should be dissolved immediately and the case dismissed.

All of the federal courts of appeals that have considered this question have found that arbitrators enjoy strict arbitral immunity from precisely the sort of lawsuit Med-Partners filed against them in state court—a suit designed to interfere with arbitral jurisdiction. *See, e.g., New England Cleaning Servs., Inc. v. AAA,* 199 F.3d 542, 545 (1st Cir.1999) (finding that "the AAA's decision to process the demand was protected by arbitral immunity"); *Olson v. National Ass'n of Secs. Dealers,* 85 F.3d 381, 382 (8th Cir.1996) (stating that because the role of the arbitrator is functionally equivalent to the role of a judge, federal courts have uniformly extended judicial and quasi-judicial immunity to arbitrators); *Tamari v. Conrad,* 552 F.2d 778, 780 (7th Cir.1977) (concluding that "arbitral immunity should be extended to cases where the authority of an arbitrator to resolve a dispute is challenged"). This conclusion also is warranted under Florida law.[8] *See Hospitality Ventures v. American Arbitration Ass'n,* 755 So.2d 159, 160 (Fla. 4th DCA 2000) (noting that "[t]he only proper parties to a lawsuit under section 682.03 to determine the propriety of arbitration are the parties to the arbitration agreement, not the potential arbitrators. The law does not require potential arbitrators to expend the time and money to participate in a lawsuit where the parties are fighting over the arbitrability of a dispute.").[9] As a matter of policy, this law is quite sensible. Just as it would interfere unduly with the legal system to permit suits against empaneled jurors, a suit against a chosen arbitration panel threatens to scuttle the efficacy of arbitration and to intimidate the panel from adjudicating the dispute. For this very reason, no doubt, the AAA Rules, to which MedPartners agreed, provide at Rule R–50(d) that "[n]either the AAA nor any arbitrator shall be liable to any party for any act or omission in connection with any arbitration conducted under these rules." Moreover, a pre-arbitration injunction also is unnecessary to protect MedPartners' legal interests since an arbitration award is subject to judicial review through a motion to modify, amend, or vacate the award—just as a jury verdict is subject to appellate review. Simply put, if an unwarranted award is levied against MedPartners or the arbitration panel is composed of biased or unqualified members, MedPartners has a federal judicial remedy available. Accordingly, I conclude that the injunction should be dissolved against the AAA.[10]

In its opposition to the Center's memorandum submitted in response to this Court's

---

8. In its September 10, 2001 submission, Med-Partners asserts that Alabama law applies to this issue, which is dubious on these facts, and that under that state's law, an injunction can be brought against the AAA to enjoin that entity from conducting an improper arbitration. In support, MedPartners cites *Riscorp, Inc. v. Occupational Safety Ass'n of Alabama Workmen's Compensation Fund,* 796 So.2d 1062 (Ala. 2000). In that unpublished decision, the Alabama Supreme Court affirmed the trial court's grant of a preliminary injunction enjoining the AAA from administering the arbitration. However, the focus of the court's opinion was squarely upon the alleged misconduct of one of the parties, who had failed to arbitrate in direct contravention of a court order to do so, and the court did not even broach the subject of arbitral immunity. *See id.* at 1064–66. Further, the court did not address the AAA's conduct except insofar as it touched upon the actions the parties themselves. Therefore, this case does not stand for the proposition asserted by MedPartners—which would contravene most federal law on this issue—that Alabama courts allow injunctions against the AAA in situations such as the one presented here.

9. MedPartners disputes this authority by claiming that the *Hospitality Ventures* case applies only to section 682.03 of the Florida Statutes. However, this section is "similar to section 2 of the Uniform Arbitration Act," *see* Fla.Stat.Ann. § 682.03 (comment), which in turn is patterned on the Federal Act. *See Cecala v. Moore,* 982 F.Supp. 609, 612 n. 3 (N.D.Ill.1997). Therefore, this case is persuasive here.

10. Plaintiff also raises procedural arguments against the injunction such as due process and the fact that the Center was an indispensable party to the injunction request. I find no need to rule on these issues given my conclusion that the arbitrators are immune from the injunction.

August 16, 2001, Order, MedPartners argues that the caselaw evidences the conclusion that arbitral immunity does not operate to shield arbitrators from claims for purely equitable relief, as MedPartners obtained in the Alabama court. However, this seems to be a distinction without a difference. There is no reason to conclude that a court finding that arbitral immunity extends to damages claims as well as claims for equitable relief would not reach the same conclusion had the claims been solely for the latter. *See, e.g., New England Cleaning Servs., Inc.,* 199 F.3d at 545–46 (affirming district court's dismissal of claims for damages *and* injunctive relief because AAA enjoyed arbitral immunity).

D. *MedPartners' Federal Action Against the Orthopedic Center*

 Plaintiff also asks this Court to dismiss MedPartners' federal suit against the Orthopedic Center because its claims for "fraud" and "breach of contract" are subject to arbitration under 9 U.S.C. § 3 and section 682.03(3) of the Florida Statutes. Under the law, a party may not evade an arbitration clause by stating in a lawsuit its defenses to the claim in arbitration. "To hold otherwise would allow plaintiffs to avoid the obligation of arbitration by 'artfully pleading' their claims and would, in our view, eviscerate the strong policy favoring arbitration." *Terwilliger v. Greyhound Lines,* 882 F.2d 1033, 1037–38 (6th Cir.1989). Where a complaint presents squarely arbitrable issues for adjudication, a party may not sidestep arbitration by selectively couching the underlying dispute in terms of "fraud" or "breach of contract" or "declaratory judgment." In determining whether a particular claim falls within the scope of the parties' arbitration agreement, a court must focus on the allegations in the complaint rather than the legal causes of action asserted. *See Gregory v. Electro–Mechanical Corp.,* 83 F.3d 382, 384 (11th Cir. 1996). If fraud is alleged, judicial consideration is appropriate only where the alleged fraud relates specifically to inducement of the arbitration provision; allegations of fraud pertaining to a contract as a whole must be resolved in arbitration. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *see also Benoay v. Prudential–Bache Secs., Inc.,* 805 F.2d 1437, 1441 (11th Cir. 1986); *Western International Media Corp. v. A.R. Johnson,* 754 F.Supp. 871, 872–73 (S.D.Fla.1991).

 In this case, MedPartners' complaint against the Orthopedic Center directly implicates the issues presented in arbitration as it consists of MedPartners' defenses to the Orthopedic Center's compensation claims in the pending arbitration.[11] The pending arbitration sought by the Orthopedic Center directly places at issue MedPartners' asserted defense for failing to compensate the Orthopedic Center physicians under the guaranteed minimum compensation clause—specifically, the allegation that the "level of industry" of the Orthopedic Center physicians had declined below their contractual obligations. The Orthopedic Center contends that MedPartners' accusation/defense is pretextual, and was leveled by MedPartners to further its announced corporate strategy to divest itself of all physician management contracts, which it has carried out. At a minimum, MedPartners' suit is inextricably interwoven with the issues to be addressed in arbitration between the parties,

---

11. For example, MedPartners alleges:

The Original Shareholders represented to MedPartners that their level of industry would remain consistent with prior levels. (¶ 11)

[T]he defendants intended to engage in a scheme to diminish their own workloads and productivity.... (¶ 12)

Pursuant to section 5.1(a) of the Amended CSA, the P.A. acknowledged that the Original Shareholders would 'conduct a vigorous medical practice' on behalf of the P.A. (¶ 15)

Since the execution of the Amended CSA in January 1996, the Original Shareholders' gross charges for professional services has, for the most part, steadily declined during each of the past three years... which is a breach of the P.A.'s contractual obligation that the Original Shareholders would conduct a vigorous medical practice on behalf of the P.A..... (¶ 17)

[O]n or about May 13, 1999, MedPartners, pursuant to the Amended CSA, made a good faith determination that the Original Shareholders and the employees of the P.A. were not devoting a 'substantially equivalent level of industry and diligence' to the P.A. as they had devoted to the P.A. before the effective date of the CSA. (¶ 18)

and therefore are subject to arbitration under both federal and Florida law.[12] *See A.G. Edwards & Sons, Inc. v. Bing,* 446 So.2d 134 (Fla. 4th DCA 1983) (observing that transactions clearly not subject to arbitration are "inextricably interwoven" with arbitrable matters, and therefore all issues are subject to arbitration). It is therefore appropriate to dismiss this suit since it is subject to arbitration under federal and Florida law.

### E. *Plaintiff's Sanctions Request*

The Orthopedic Center seeks fees under section 57.105 of the Florida Statutes and *Hospitality Ventures,* arguing that MedPartners' suit against the AAA was substantially without legal or factual support. While section 57.105 applies in a diversity case under Florida law, based on the facts and arguments of this lengthy proceeding, I decline to award sanctions against MedPartners. ·

### III. Conclusion

IT IS THEREFORE ORDERED AND ADJUDGED:

1. The Court orders · MedPartners and the AAA to promptly proceed with the arbitration of all of the Orthopedic Center's amended claims. Plaintiffs' Renewed Motion to Compel Arbitration (DE# 49) is GRANTED IN PART

2. Accordingly, MedPartners' renewed motion to dismiss the original and amended complaint to compel arbitration (DE# 55) is DENIED.

3. The injunction against the American Arbitration Association is hereby dissolved *ab initio. MedPartners v. AAA* is hereby DISMISSED WITH PREJUDICE, with the Court reserving jurisdiction to tax costs and award attorneys' fees against MedPartners with regard to that action. The Orthopedic Center and the AAA may submit appropriate

fees or costs applications, if applicable, within 14 days of this Order.

4. *MedPartners v. Brandon Jones, et al.* is STAYED pending arbitration under the Commercial Arbitration Rules of the AAA.

5. MedPartners' Motion to Excuse the Arbitration Panel (DE# 58) is DENIED.

6. The Court retains jurisdiction to enforce the Court's orders, to confirm, modify, amend, or vacate the Arbitrators' award, and to award or confirm the award of attorneys' fees and costs of this litigation and the arbitration.

7. This case is CLOSED and all pending motions are DENIED AS MOOT.

---

12. MedPartners also cannot evade arbitration on these issues by naming the Center's shareholders as individual defendants. Employees and agents of parties to arbitration agreement are bound to such agreement under ordinary contract principles. *See Arnold v. Arnold Corp.,* 920 F.2d 1269 (6th Cir.1990). Florida law is in accord. *See*

*Ocwen Fin. Corp. v. Holman,* 769 So.2d 481, 483 (Fla. 4th DCA 2000). Therefore, if the Orthopedic Center itself is bound to the arbitration agreement, then its individual employees and agents are as well, and MedPartners cannot sidestep actual arbitration in this manner.